IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WILLIAM M. ALLEN,

        Petitioner,

   v.

JOE LIZARRAGA, Acting Warden,

       Respondent.[1]

No. C 10-4516 CW (PR)

ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

Petitioner William M. Allen, a state prisoner proceeding pro se, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state criminal conviction, in which he asserts the following claims: (1) due process violation based on the trial court's refusal to suppress his confession to a minister; (2) insufficient evidence to support his assault conviction; (3) ex post facto clause violation based on the court's failure to strike two of his prior convictions; (4) erroneous denial of his state habeas petition based on substantial delay; (5) due process violation based on the court ordering him to wear a leg brace during trial; (6) ineffective assistance of trial counsel; and (7) ineffective assistance of appellate counsel. For the reasons discussed below, the Court DENIES the petition and a certificate of appealability.

---

[1]In accordance with Habeas Rule 2(a) and Rule 25(d)(1) of the Federal Rules of Civil Procedure, the Clerk of the Court is directed to substitute Acting Warden Joe Lizarraga as Respondent because he is Petitioner's current custodian.

**United States District Court**
For the Northern District of California

BACKGROUND

I. Procedural History

   In 2005, a Santa Cruz County jury found Petitioner guilty of multiple sex crimes.  3 Clerk's Transcript (CT) at 703.  On November 7, 2005, the trial court sentenced Petitioner to 260 years to life in prison.  6 CT 1406.  On August 18, 2006, Petitioner appealed his conviction, asserting the following federal claims: (1) First Amendment and due process violations based on the admission of his confession to Reverend Vining; (2) ineffective assistance of counsel because counsel allowed the prosecutor to have access to Petitioner's psychological evaluation; and (3) ex post facto clause violation based on the trial court's failure to strike his prior sex-crime convictions. On January 25, 2008, the California Court of Appeal affirmed the judgment.  Exh. 9; People v. Allen, 2008 WL 214856, (Cal. App. Jan 25, 2008) (unpublished).  On April 30, 2008, the California Supreme Court summarily denied review.  Exh. 11.

   On August 3, 2009, Petitioner filed a petition for a writ of habeas corpus in the Santa Cruz County Superior Court.  On October 2, 2009, the Superior Court denied the petition because it was filed late without justification for the significant delay or an explanation of why many of the claims were not addressed on direct appeal.  Pet.'s Exh. M; Resp's Exhs. 12-13.  His petitions to the California Court of Appeal and California Supreme Court were summarily denied.  Exhs. 14, 16, 17.

   On October 6, 2010, Petitioner filed this federal petition for a writ of habeas corpus.  On November 17, 2010, the case was dismissed without prejudice because Petitioner had failed to file

a complete application for leave to proceed in forma pauperis.  On

June 26, 2012, the Court granted Petitioner's motion to reopen his

action, vacated the order of dismissal, granted leave to proceed

in forma pauperis and directed Respondent to show cause why the

petition should not be granted.  The petition now is fully briefed

and ready for the Court's review on the merits.

II. Statement of Facts

    The California Court of Appeal summarized the facts of this

case as follows:

> On October 6, 2002, defendant, who had a history of
> committing violent sex crimes, committed a series of
> forcible sexual assaults on J.N. after forcing her to a
> secluded location in Santa Cruz County.  He intended to
> murder her after ending his series of assaults but
> changed his mind because he did not want her three-year-
> old son, who had stayed in her car during the ordeal, to
> grow up motherless.  J.N. survived and testified against
> defendant.
>
> I. Prosecution Case
>
> J.N. was parked by the side of a remote private road to
> relax.  She opened her eyes when she heard the rattle of
> a dilapidated automobile.  She recognized the rattle as
> the same distinct sound of a poorly maintained
> automobile that she had heard several times at the home
> of her partner R.F.  Defendant emerged from the
> automobile, asked J.N. if she was all right, and drove
> away.  Minutes later he returned, strangled her by the
> neck through the driver's window so that she almost lost
> consciousness, and told her not to scream or he would
> kill her.  Defendant's eyes betrayed his rage.  He
> forced her to go with him into or through a secluded
> copse of redwood trees that shielded them from being
> viewed from the road.  Thereafter he proceeded to force
> her to orally copulate him.  He told her that she was
> "good at this."  During that crime defendant mentioned
> J.N.'s "girlfriend," and J.N. realized defendant's
> automobile had been used to prowl around R.F.'s house.
>
> Thereafter defendant proceeded to sodomize J.N. three
> times and rape her three times, causing her great pain.
> He also hit her in the ribs twice, bit her on the
> shoulder, and threatened to whip her with his belt.
> Defendant told her "I was in prison for 20 years.
> Believe me it's nothing to kill you."

United States District Court
For the Northern District of California

Defendant bound and gagged J.N. and told her that he was faced with a dilemma: he felt that he had to kill her so that she could not identify him, but also felt that he could not leave her son without a mother.  He explained that his mother was killed or died from other causes when defendant was 15 or 16 years old.  Remorseful, he released her, but not before stealing $105 from her purse.

J.N. drove to R.F.'s house and appeared in emotional distress, disheveled, bruised, and scraped.  She insisted that R.F. not call law enforcement, telling her that her assailant had threatened to kill them if they did.  Defendant had told her words to the effect of "'I am going to let you go, but if you call the cops, . . . I didn't survive prison for 20 years without friends. Someone will be at your house and kill you and everyone there.'"  R.F. called law enforcement anyway.  A responding sheriff's deputy found J.N. "very distraught" and "kind of frantic," cut, bruised, disheveled, and with twigs and other foreign matter in her hair.

R.F.'s house was near the edge of the Forest of Nisene Marks, a wildland park, and was along a remote private dead-end road with little traffic.  For a month or two before the attack on J.N., R.F. had heard a loudly running automobile near her property.  Ordinarily there was no nighttime traffic, but she had heard the distinctive sound as late as 1:00 a.m.  After the attack on J.N., R.F. never heard that automobile again.

When sheriff's deputies arrested defendant he was driving what one deputy described in testimony as an "abnormally loud" automobile.  Defendant acknowledged to the deputies that he had been in prison for 20 years and that his mother had died when he was 15 years old.  The testifying deputy noticed scratches on defendant's arms and that defendant had an injured knee.

J.N. identified defendant in a photographic lineup and also was able to identify his automobile, an Opel. Deoxyribonucleic acid (DNA) evidence taken from the bite on J.N.'s shoulder matched defendant's DNA.

J.N. testified that she had never met defendant or even seen him before the spree of sex crimes he committed against her.

As will be described in detail post, page 11, defendant confessed to a local pastor, Ronald Roy Vining, that he had sexually assaulted J.N.

There was evidence that defendant had committed similar crimes.  Sheila B. testified that in 1977 defendant accosted her on the beach in Pacifica (San Mateo County) and forced her to orally copulate him.  He complained

that she "wasn't very good at this."  During the attack
he hit her in the ribs.  Sandra H. testified that in
1980 she and defendant visited the beach at Pacifica.
On the way home defendant stopped the car, put her in a
headlock, and thereafter forcibly sodomized and raped
her several times, also forcing her to orally copulate
him.

II. Defense Case

Defendant testified on his own behalf.  He did not
dispute engaging in sexual activity with J.N. at the
location she identified, but contended that it was
consensual and that he roughed her up as part of a plot
in which the two were conniving.  He and J.N. had met in
1979 on the Santa Cruz boardwalk.  Defendant was at a
coffee house in Aptos on September 15, 2002, when J.N.
and her son walked in, and they recognized each other
from their 1979 encounter.  Defendant told J.N. that he
had been in prison for sex crimes and was now living in
a trailer near a church.  J.N. asked defendant if the
two could meet in the following week.  They met at a
parking lot and J.N. told defendant she wanted to get
full custody of her son, live with R.F., and continue to
receive child support from her son's father.  "She
wanted to stage a rape so that she could go to him with
all the characteristics of a rape and break away from
him."  She told defendant, "I know you had experience
with this.  So I am wondering if you can help me stage
this without causing unnecessary pain."  After telling
J.N. "My schedule's pretty full" defendant decided to
proceed and realized he would need to create evidence,
discoverable on her body, that she had been accosted,
restrained, and sexually assaulted.  J.N. agreed but
again asked to be hurt as little as possible.  She
agreed not to report anything to the police.

J.N. and defendant met in the remote location to carry
out the plot.  She was waiting for defendant with her
son in the back seat when he arrived.  J.N. led
defendant to a secluded area in which they engaged in
consensual vaginal and anal intercourse.  Defendant
physically assaulted J.N. with her consent, including
punching and biting her, to make the feigned sexual
assault look more real.  J.N. paid defendant for staging
the assault.

After defendant's arrest, Vining visited him in jail and
pressed him to confess.  Vining asked, "'Did you do it?
Just say you did.'"  Defendant replied, "'Not the way
they're saying it.'"  He never told Vining that he had
raped J.N.

On cross-examination, defendant stated that when
questioned by the sheriff's deputies he lied about his
whereabouts on the day of the crimes, but did so because

United States District Court
For the Northern District of California

1
2

J.N. and he had agreed that the police would not be allowed to connect him with the staged assaults. Defendant denied monitoring the house at which J.N. and R.F. were living.

3

II. Prosecution Rebuttal Case

4
5
6
7

The father of J.N.'s son testified that he knew about her relationship with R.F. and there was no tension between the three of them generally or between him and J.N. regarding the upbringing of their son.  J.N. provided similar testimony and reiterated that she had never seen defendant before he assaulted her.

8

People v Allen, 2008 WL 214856, at *1-3.

9

LEGAL STANDARD

10

A federal court may entertain a habeas petition from a state

11

prisoner "only on the ground that he is in custody in violation of

12

the Constitution or laws or treaties of the United States."  28

13

U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death

14

Penalty Act (AEDPA) of 1996, a district court may not grant habeas

15

relief unless the state court's adjudication of the claim:

16

"(1) resulted in a decision that was contrary to, or involved an

17

unreasonable application of, clearly established Federal law, as

18

determined by the Supreme Court of the United States; or

19

(2) resulted in a decision that was based on an unreasonable

20

determination of the facts in light of the evidence presented in

21

the State court proceeding."  28 U.S.C. § 2254(d); Williams v.

22

Taylor, 529 U.S. 362, 412 (2000).

23

A state court decision is "contrary to" Supreme Court

24

authority, that is, falls under the first clause of § 2254(d)(1),

25

only if "the state court arrives at a conclusion opposite to that

26

reached by [the Supreme] Court on a question of law or if the

27

state court decides a case differently than [the Supreme] Court

28

has on a set of materially indistinguishable facts."  Id. at 412-

13.  A state court decision is an "unreasonable application of"

United States District Court
For the Northern District of California

Supreme Court authority, under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. Id. at 409.  Under AEDPA, the writ may be granted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d). Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).  In the present case, the highest court to issue a reasoned decision on three of Petitioner's claims is the California Court of Appeal.

If no state court has adjudicated a federal claim on the merits, the federal court must review the claim de novo. Cone v. Bell, 556 U.S. 449, 472 (2009); see also Pirtle v. Morgan, 313 F.3d 1160, 1167-68 (9th Cir. 2002) (holding that de novo standard

of review rather than the deferential standard of § 2254(d) applies where state courts never reached merits of habeas claim). As discussed below, there is no reasoned state court decision for the claims Petitioner presented in his state habeas petitions and the Court reviews those claims de novo.

DISCUSSION

I. Claims Presented on Appeal

The Court first reviews the claims Petitioner presented on direct appeal.

A. Admission of Petitioner's Statements to Reverend Vining

Petitioner contends that the trial court denied his right to due process by refusing to suppress his statements to Reverend Vining.  The Court of Appeal held that Petitioner forfeited this constitutional claim because he did not make this argument to the trial court and he did not assert it until his reply on appeal. Although the Court of Appeal did not address the merits of Petitioner's constitutional claim, it addressed the merits of his related state law claim, that his confession to Reverend Vining violated California Evidence Code sections 1030-1033, which prohibit the admission of a communication made in confidence in the course of the clergy-penitent relationship.  Although a federal habeas court may not review a state court's ruling regarding a state law claim, see Swarthout v. Cooke, 131 S. Ct. 859, 861 (2011), this ruling is presented below because it pertains to other constitutional claims Petitioner asserts.

1. Superior Court Opinion

The Court of Appeal denied Petitioner's state law claim as follows:

[I]n the middle of trial, the trial court conducted a
hearing at which Vining testified outside the jury's
presence and hearing . . . . Vining testified that the
Free Methodist Church (USA) has no practice of
confessing to a pastor; rather, the parishioner
confesses directly to God.  Vining agreed with counsel
that "that was the whole point of the protestant
revolution."  Vining would not agree to keep
confidences, and was trained by the church that if
someone asked him to promise not to repeat what the
person was about to say, Vining was to "automatically"
refuse the request.  Nothing in the Pastor's Handbook
contravened this practice.  The handbook did, however,
give Vining discretion to keep confidential a
parishioner's statement about a past event "if it wasn't
illegal, if it wasn't something that was going to harm
somebody."  Vining's practice, if people came to him
saying they wanted to broach a subject confidentially,
was to tell them, "'Absolutely not,' unless it is
something that isn't illegal or something that is going
to go against our bible and our beliefs."

Vining further testified that he met defendant at a
coffee shop in Capitola and that defendant told Vining
he had recently been released from prison and was about
to be evicted from a trailer park.  Defendant asked
Vining for help.  Vining moved defendant's trailer onto
church property and provided him with free electrical
service.  In exchange, defendant served as the
property's caretaker.  The church was not yet
operational; Vining had been sent there to revive its
congregation and facilities.  The two developed a "very
deep" friendship.  Vining considered himself to be
defendant's landlord and employer as well as defendant's
friend.  In addition, the two would talk about God
together.

Vining was "devastated" when he learned of the charges
against defendant because he had "just poured ten months
of my life into keeping him away from doing what I had
heard had happened."  He went to see defendant to find
out if he had committed the crimes and if so, what could
have prompted him after the opportunities Vining had
extended to him to succeed in life.  Vining insisted
that he did not visit defendant to take defendant's
confession, and had no ecclesiastical writ to do so.  "I
went as a friend wondering why he had done what he did
to me as a friend."

When Vining entered the attorney-client conference room,
defendant asked him "'What are you doing here?'"  Vining
replied, "'Billy, I am here because I am your friend and
probably your only friend right now.'"  Defendant also
asked Vining, "'Are you here to take my confession?'"
Vining replied that "our church does not have the belief
of confession."  Defendant did not ask Vining to keep

United States District Court
For the Northern District of California

private any conversation that the two might have.
Vining did not perceive that defendant was making a
confidential communication to him.

After receiving defendant's statement that he raped
J.N., Vining later informed a jailer, Sergeant McAulay,
and other people about it.

On cross-examination, Vining testified that everything
he did in life was part of his ministry.  He agreed with
counsel that everything he did he "consider[ed] as part
of God's world."  He would discuss scripture with
defendant and acknowledged that he was defendant's
minister.  During their meeting in jail, Vining
discussed scripture with defendant.  Vining did not tell
defendant that he would not keep confidential anything
defendant said.

Cross-examination also revealed that when defendant
originally asked Vining if Vining was there to take his
confession defendant had a smirk on his face.  When
defendant made his remark, Vining explained to him that
unlike the Roman Catholic Church, the Free Methodist
Church (USA) does not believe in the intermediation of a
priesthood and that the penitent should confess directly
to God.

On redirect examination, Vining explained that he
interpreted defendant's smirk as an attempt "to lighten
the atmosphere in the room."

The trial court ruled as follows: "The pastor did not
believe the conversation was to be held in confidence.
The pastor solicited the conversation, the contact.  The
pastor believed he was acting as a friend, not in a
pastor capacity.  He told the defendant he was acting as
a friend, not take his confession.  Pastor went there to
find out whether or not the accusations were true and
find out why Mr. Allen violated his friendship.
Defendant was not a member of the church.  Pastor did
not believe he had an obligation to keep this
communication confidential . . . . I don't find the
defendant had a reasonable expectation that the
statement be kept confidential."  The court denied
defendant's motion to exclude the evidence, implicitly
ruling but without so stating that the state had
overcome the presumption that the penitent privilege
applied.

Thereafter Vining testified before the jury that he met
with defendant in the Santa Cruz County jail and
defendant told him he was guilty of one of the sexual
assaults charged against him.  Defendant described
seeing the victim's car parked by the side of the road,
noted that it appeared to be occupied by a lone woman,
and that "he dragged her out of the car and then he

United States District Court
For the Northern District of California

raped her."  Defendant denied beating the victim.
Defendant told Vining, "I realized what I did was wrong
and that I was going to get caught."  Defendant also
told Vining "that he understood that what he did was
wrong, not only illegal, but it was a sin against God.
He told me that . . . he was pleading guilty and that he
wanted a very short and quick trial.  So that there
would be no mess."

. . .

[California Evidence Code] Section 917, subdivision (a),
states, as relevant here: "If a privilege is claimed on
the ground that the matter sought to be disclosed is a
communication made in confidence in the course of the
. . . clergy-penitent . . . relationship, the
communication is presumed to have been made in
confidence and the opponent of the claim of privilege
has the burden of proof to establish that the
communication was not confidential."

. . .

. . . [S]ection 917 establishes a presumption of
confidentiality, but also that if the communication was
not intended to be kept in confidence, it is not
privileged.

. . .

Section 1033 provides that "[s]ubject to Section 912, a
penitent, whether or not a party, has a privilege to
refuse to disclose, and to prevent another from
disclosing, a penitential communication if he or she
claims the privilege."  A "'penitent' means a person who
has made a penitential communication to a member of the
clergy" (§ 1031), and a "'member of the clergy' means a
priest, minister, religious practitioner, or similar
functionary of a church or of a religious denomination
or religious organization" (§ 1030).

A "'penitential communication' means [1] a communication
[2] made in confidence, [3] in the presence of no third
person so far as the penitent is aware, [4] to a member
of the clergy who, [5] in the course of the discipline
or practice of the clergy member's church, denomination,
or organization, [6] is authorized or accustomed to hear
those communications and, [7] under the discipline or
tenets of his or her church, denomination, or
organization, [8] has a duty to keep those
communications secret." (§ 1032.)

We conclude that although Vining held the office of "a
member of the clergy" (§ 1032) when he spoke with
defendant, he was not acting in that capacity at the
time.  Hence the privilege does not apply.

11

Substantial evidence supports the trial court's explicit and/or inferable factual findings that Vining alerted defendant he was acting as a friend and was not there in the capacity of "a member of the clergy" (§ 1032). When, at the beginning of their first encounter, defendant playfully or flippantly asked Vining whether he was visiting to take his confession, Vining responded that he was not and that under the tenets of the Free Methodist Church (USA) defendant could confess only to God.  It is plain that "not every communication to a member of the clergy is privileged in the eyes of the law." (People v. Edwards (1988) 203 Cal. App. 3d 1358, 1362.)  Rather, it is necessary to show that the statement was made in confidence and in the course of the required relationship.  (See People v. Johnson (1969) 270 Cal. App. 2d 204, 207 [the defendant did not adequately show either confidentiality or a clergy-penitent relationship]; cf. People v. Thompson (1982) 133 Cal. App. 3d 419, 426 [making a point similar to ours but speaking in the disjunctive].)  The law provides that the privilege does not apply to statements made, even in confidence, to a person who happens to be a member of the clergy but who is receiving the statements outside "the course of the discipline or practice of the clergy member's church, denomination, or organization" (§ 1032).  Accordingly, we must consider the clergy member's role at the time of the communication—and Vining's role was that of defendant's friend.  (See Johnson, at pp. 206-208 [robber fleeing crime scene made self-serving statements to minister he encountered; minister was dressed in business suit, statements were not penitential and robber was not church member; held, statements not privileged].)  The privilege is limited to situations in which the speaker "confess[es] to a flawed act [in order] to receive religious consolation and guidance in return." (Thompson, at p. 427.)  The record does not show that Vining was prepared to provide consolation, solace, or guidance; rather, he was demanding to know by what right defendant could have betrayed him.  He was a friend, albeit an indignant or perhaps a furious one.

We next conclude that no privilege existed because defendant did not ask Vining to keep their conversation confidential or exhibit any behavior showing an expectation of confidentiality.  The lack of "a communication made in confidence" (§ 1032) also places defendant's statements outside the scope of the penitent's privilege.  (People v. Thompson, supra, 133 Cal. App. 3d at p. 426; People v. Johnson, supra, 270 Cal. App. 2d at p. 207.)

Accordingly, we conclude that substantial evidence supports the court's finding that no penitential communications defined by section 1032 took place in the jail interview room.  Because Vining was acting as a

friend and not as an intercessor with God, and,
independently, because nothing in the record shows
defendant sought or relied on a promise of
confidentiality, the privilege is inapplicable. (§ 917,
subd. (a).)  Defendant's claim of error under state law
does not entitle him to relief on appeal.

People v Allen, 2008 WL 214856, at *4-8.

> 2. Analysis

Petitioner first argues that the state court erred in rejecting his claim under California Evidence Code sections 1030-33 because Reverend Vining spoke to him as a pastor, not as a friend, and, because Petitioner viewed his discussion with Reverend Vining as a pastor, he reasonably expected Reverend Vining to keep his confession in confidence.  As mentioned previously, a state court's conclusion regarding a state law claim is unreviewable by a federal court on habeas review.  See Swarthout, 131 S. Ct. at 861 ("federal habeas corpus relief does not lie for errors of state law").  Therefore, this Court may not review the Superior Court's conclusion that the clergy-penitent privilege was inapplicable to Petitioner's confession to Vining.

Petitioner next claims that the admission of his confession to Reverend Vining constituted a violation of his due process rights.  According to Petitioner, in cases prior to State of Oregon v. Smith, 494 U.S. 872 (1990), "the Free Exercise Clause of the First Amendment provided an exemption from state or federal laws if that law had the effect of unduly burdening the free exercise of religion . . . and if there was an undue burden in a given instance, the state had to justify the imposition by a compelling interest."  Pet. at 93-94 (citing Jimmy Swaggart Ministries v. Board of Equalization, 493 U.S. 378, 384-85 (1990)

United States District Court
For the Northern District of California

and <u>Wisconsin v. Yoder</u>, 406 U.S. 205, 220 (1972)).[2]  Although Petitioner acknowledges that these pre-1990 cases were overruled by <u>Smith</u>, he concludes that, because the clergy-penitent privilege "is congruent with the Free Exercise Clause in its pre-1990 manifestation, with its requirements establishing on a case-by case basis the pre-1990 constitutional foundation as well as the evidentiary foundation," a protected liberty interest exists.  <u>Id.</u> at 94.

This claim fails for many reasons.  First, no authority holds that a liberty interest can be created based on Supreme Court authority that was good law over twenty years ago, but not at the time the events at issue took place.  Second, even if such a liberty interest could be created, Petitioner does not describe the liberty interest and how it was violated.  Third, even if such a liberty interest could be created, Petitioner misapplies his cited pre-1990 authority regarding the free exercise clause.

In <u>Jimmy Swaggart Ministries</u>, the Court stated that the free exercise Clause "withdraws from legislative power, state and federal, the exertion of any restraint on the free exercise of religion.  Its purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority. . . . [T]he free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden."  493 U.S.

_____

[2] Because Petitioner relies on pre-1990 cases, the Court does not address the holding in <u>Smith</u> or authority that relied on or overruled it.

United States District Court
For the Northern District of California

at 384-85.  Using this principle, <u>Jimmy Swaggart Ministries</u> and <u>Yoder</u> examined laws that were neutral on their face to determine if their application infringed upon the respondents' exercise of their religion.  <u>See</u> <u>Jimmy Swaggart Ministries</u>, 493 U.S. at 385-89 (holding State's imposition of a sales and use tax on ministries' sale of religious material did not infringe upon their Free Exercise rights); <u>Yoder</u>, 406 U.S. at 234-35 (holding First Amendment prevents State from compelling Amish parents to comply with state law requiring parents to send their children to formal high school to age sixteen).

Petitioner does not show how the denial of the clergy-penitent privilege placed a substantial burden upon his exercise of religion.  In fact, the evidence shows that the clergy-penitent privilege had no effect on Petitioner's exercise of religion. Reverend Vining testified that Petitioner had no ties to Reverend Vining's church, 8 RT 2171, and the trial court found that Petitioner was not a member of Reverend Vining's church, 8 RT 2116.  Petitioner fails to point to any evidence to the contrary or that he is a member of another religion.  This is fatal to Petitioner's claim.  For all of the above-mentioned reasons, this claim is denied.

B. Ineffective Assistance of Counsel

1. Court of Appeal Opinion

On appeal, Petitioner contended his trial counsel was ineffective because he allowed the prosecutor to have access to Petitioner's psychological evaluation.  The report included Petitioner's statements to the psychologist that he had fantasized

15

about raping women when he was in prison.  The Court of Appeal

denied this claim, finding no prejudice, as follows:

> . . . [F]ormer counsel asked for or at least acquiesced
> in the preparation of a publicly available report on
> defendant's psychological condition.  When defendant
> obtained new trial counsel, his new counsel moved to
> have his statements suppressed, in part because former
> counsel was ineffective in permitting the prosecution to
> obtain them.
>
> The trial court denied the motion on the ground that
> "[t]here was a tactical reason for it.  I can't tell
> from the record what that might have been, however, in
> hindsight, illogical it seems, but there was a tactical
> reason for that. . . ."  The court added that defendant,
> for reasons the court acknowledged were mysterious, had
> knowingly and intelligently waived his right to a
> private psychological evaluation.
>
> . . .
>
> . . . [F]ormer defense counsel admitted that he had no
> tactical reason for permitting the psychological
> evaluation to be made available to the prosecution.
> Former counsel told the trial court, "I obtained a
> public report, mistakenly thinking that Mr. Allen had
> given me the green light to do so.  I would not have
> sought a public evaluation, one public to the District
> Attorney and the court, had I known Mr. Allen was
> objecting to it."  Moreover, even if defendant had not
> objected, indeed even if defendant had demanded the
> production of a public report, "counsel, as 'captain of
> the ship,' maintains complete control of defense tactics
> and strategies, except that the defendant retains a few
> 'fundamental' personal rights" (People v. Cook (2007) 40
> Cal. 4th 1334, 1343), and counsel could have said no.
> We agree with defendant that there was no tactical
> reason for permitting a report to be divulged without
> knowing what it might reveal.  As it happened, the
> report was damning: the psychologist concluded that
> defendant did not suffer from any "major mental disorder
> or mood disturbance," but rather that "[h]is behavior
> demonstrates a strong degree of psychosexual deviance
> and sexually aggressive motivation for the rapes,
> pathologic egocentricity, limited empathy and remorse,
> and aggressive narcissism.  He has exhibited a
> callous[,] remorseless use of others within a
> chronically unstable and antisocial lifestyle."  And he
> "is certainly at very high risk for recidivism with
> regard to rape behavior."
>
> Nonetheless, we discern no prejudice, i.e., no
> reasonable probability of a different outcome

> (Strickland v. Washington, 466 U.S. 668, 694 (1984), had
> defense counsel acted in such a manner that the jury
> would not have heard evidence about defendant's rape
> fantasies.  There was strong evidence against defendant
> apart from that evidence.  The victim testified in
> detail and at length about the multiple sexual assaults
> defendant committed.  It was plain that defendant had
> stalked the victim and her partner.  Defendant's friend
> Ronald Vining, a minister and defendant's benefactor in
> a number of ways, testified that defendant admitted
> raping the victim.  The victim's partner described the
> victim's return to the house in disarray and distress.
> Defendant's own testimony, that the victim consented to
> a bizarre staged sexual assault in order to have full
> custody of her child, made little sense on its own and
> was refuted by the rebuttal testimony of the victim and
> her son's father.  There is no reasonable probability
> that, but for counsel's failure to take actions to keep
> the prosecution from learning of defendant's rape
> fantasies, the outcome would have differed.

People v. Allen, 2008 WL 214856, at *10-11.

        2. Analysis

     A claim of ineffective assistance of counsel is cognizable as

a claim of denial of the Sixth Amendment right to counsel, which

guarantees not only assistance, but effective assistance of

counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The

benchmark for judging any claim of ineffectiveness must be whether

counsel's conduct so undermined the proper functioning of the

adversarial process that the trial cannot be relied upon as having

produced a just result.  Id.

     First, the petitioner must show that counsel's performance

was deficient.  Id. at 687.  This requires showing that counsel

made errors so serious that counsel was not functioning as the

"counsel" guaranteed by the Sixth Amendment.  Id.  Judicial

scrutiny of counsel's performance must be highly deferential, and

a court must indulge a strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance.

Id. at 689.

**United States District Court**
For the Northern District of California

Second, the petitioner must show that counsel's errors were so serious as to deprive the petitioner of a fair trial, a trial whose result is reliable. Id. at 688. The petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different; a reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. at 694. The likelihood of a different result must be substantial, not just conceivable. Harrington v. Richter, 131 S. Ct. 770, 792 (2011). Where the state court rejects an ineffective assistance claim based on a finding of no prejudice, habeas relief is warranted only if that determination was objectively unreasonable. Woodford v. Visciotti, 537 U.S. 19, 26-27 (2002)(per curiam)(deferring to state court's conclusion of no prejudice); Cullen v. Pinholster, 131 S. Ct. 1388, 1410 (2011) (even assuming counsel performed deficiently, it was not necessarily unreasonable for the state court to conclude that the petitioner had failed to show a substantial likelihood of a different sentence).

The only evidence from the psychological report that the jury heard was that Petitioner had rape fantasies over a decade earlier. See Allen, 2008 WL 214856, at *9 (prosecutor used report to cross-examine Petitioner about whether he had rape fantasies; Petitioner admitted having fantasies fifteen years ago but not since his release from prison in January 2002). Even without the rape fantasy evidence, there was a strong case against Petitioner, as discussed by the Court of Appeal. Moreover, the jury heard evidence that Petitioner had committed two similar sexual offenses in the past.

United States District Court
For the Northern District of California

Given the strong evidence against Petitioner, it was not objectively unreasonable for the state court to conclude that there was no reasonable probability that, but for counsel's failure to keep the prosecutor from learning of defendant's rape fantasies, the outcome would have been different.  This claim is denied.

C. Ex Post Facto Clause Violation

Petitioner contends that the trial court's failure to strike two prior sex-crime convictions, which were used to enhance his sentence, violated the ex post facto clause.

A federal habeas petitioner generally may not attack the constitutionality of a prior conviction used to enhance a later sentence.  "[O]nce a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid.  If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained." Lackawanna County Dist. Attorney v. Coss, 532 U.S. 394, 403-04 (2001) (citation omitted).  The only exception to this rule is that a petitioner may challenge a prior conviction on the ground that there was a failure to appoint counsel in that case in violation of the Sixth Amendment.  Id. at 404.  Petitioner does not argue that he was not represented by counsel in his prior cases.  Therefore, he cannot attack the constitutionality of the prior convictions in this habeas proceeding.

II. Claims Presented in State Habeas Petitions

     A. State Court Erred in Denying Petition as Untimely

     Petitioner's remaining claims were presented in his state habeas petitions.  Citing In re Clark, 5 Cal. 4th 750, 765 (1993), the Santa Cruz County Superior Court denied the petition on the ground that Petitioner had provided "insufficient justification for the significant delay in presenting these claims."  Pet., Ex. M, In the Matter of William M. Allen, for Writ of Habeas Corpus, No. F05911, at 2 (Oct. 2, 2009).  Petitioner argues that the Superior Court erred in denying his petition based on significant delay because, although it was filed ten months "from receipt of record on appeal," it was filed within the one-year statute of limitations deadline under AEDPA.  Pet. at 76.  This argument fails because whether a petition is filed timely in state court is determined by state law, not by AEDPA.  See Bonner v. Carey, 425 F.3d 1145, 1148 (9th Cir. 2005) amended on other grounds by 439 F.3d 993 (9th Cir. 2006)(under AEDPA, properly filed state petition means its delivery and acceptance are in compliance with applicable laws and rules governing filings in that state); In re Robbins, 18 Cal. 4th 770, 780 (1998) (state petition not entitled to presumption of timeliness if filed more than ninety days after final due date for filing appellant's reply brief on direct appeal).  Because Petitioner's state petition was filed ten months from his receipt of his record on appeal, it was late under Robbins.  Petitioner's claim of error is denied.

     However, Respondent has not argued that Petitioner's claims are procedurally defaulted under California's timeliness bar; therefore, any procedural default argument is waived.  See

20

Morrison v. Mahoney, 399 F.3d 1042, 1046-47 (9th Cir. 2005)
(procedural default is an affirmative defense which must be raised
in first responsive pleading to avoid waiver).

Because the Superior Court denied Petitioner's habeas claims
on procedural grounds, it did not address their merits.  The
summary denials of Petitioner's petitions by the California Court
of Appeal and California Supreme Court mean that these courts
adopted the reasoning of the Superior Court and denied the
petitions on procedural grounds.  See Ylst, 501 U.S. at 803, 805
(federal habeas court looks through to last highest court to issue
an opinion).  Because no state court reached the merits of
Petitioner's habeas claims, the Court must review them de novo.
See Pirtle, 313 F.3d at 1167-68.

B. Due Process Claim Based on Use of Physical Restraints

Petitioner contends that the trial court violated his right
to due process by ordering him to wear a leg brace during the
trial.

1. Factual Background

On September 19, 2005, the trial court held a hearing on
Petitioner's oral motion to remove the leg brace that he had been
ordered to wear under his pants during the trial.  5 RT 1001;
Pet., Ex. K at 3.  Defense counsel argued that California Supreme
Court authority required a showing of a manifest need for any
physical restraint.  5 RT 1001.  The trial court stated that
Petitioner had been involved in approximately thirty incidents
while in jail, including possessing an altered razor, altered
staples and other contraband in his cell, fighting with another
inmate, using inappropriate language and cursing at the medical

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

nursing staff.  5 RT 1003-04.  The court concluded that requiring Petitioner to wear a leg brace under his pants was "the minimal restrictive action."  5 RT 1004.

The court granted defense counsel's request that, on the day Petitioner testified, the court security officer allow him "in court without his knee brace so that when he walks up to the stand he doesn't have to show any sign that he has a restraint on."  11 RT 2505.  However, on the day Petitioner was to testify, the court security officer did not allow him to take off the leg brace. Only after defense counsel intervened did the court security officer allow Petitioner in the courtroom without the leg brace.

2. Federal Authority

The Constitution forbids the use of shackles (or other physical restraints) visible to the jury absent a trial court determination, in the exercise of its discretion, that the use is justified by an essential state interest—such as the interest in courtroom security—specific to the defendant on trial.  Deck v. Missouri, 544 U.S. 622, 624 (2005); Holbrook v. Flynn, 475 U.S. 560, 568-69 (1986); see also Hedlund v. Ryan, 750 F.3d 793, 803 (9th Cir. 2014) (finding state court decision affirming use of leg brace was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent where ordering the leg brace was justified by an essential state interest).  Generally, the defendant's right to due process is violated if the trial court fails to make a finding on the record justifying the necessity of physical restraints.  Larson v. Palmateer, 515 F.3d 1057, 1063 (9th Cir. 2008).  However, even if a defendant is shackled in error, when the shackles are not seen by the jury, the

shackling itself has been held to be harmless error.  Rhoden v.

Rowland, 172 F.3d 633, 636 (9th Cir. 1999).

        3. Analysis

    Petitioner's due process claim fails for two reasons.  First,

he has not shown that the jury saw the leg brace.  See Pet., Ex.

K, App'x 3 at 2 (appellate counsel's letter to Petitioner)

(appellate counsel stated nothing in the record indicated jurors

saw the leg brace).  Under Deck, this is fatal to Petitioner's

claim.  Second, the trial court held a hearing at which it cited

instances in which Petitioner had displayed violent or

obstreperous behavior in the jail.  Under Larson, the trial

court's findings justifying the necessity of the leg brace shows

that Petitioner's due process rights were not violated.

    Petitioner argues that the trial court's hearing on his

motion to remove the leg brace was flawed in that the court used

information from an unidentified source to determine the need for

a leg brace and the court would not allow defense counsel to view

the information.  Pet. at 25.  The trial court relied on incident

reports from Petitioner's jail.  5 RT 1002.  No clearly

established federal law suggests that it is impermissible for a

trial court to base its finding about the need to restrain a

defendant during a trial on hearsay evidence coming from jail

officials.  See Hedlund, 750 F.3d at 802-03 (not unreasonable for

state court to find that defendant posed an escape risk based on

hearsay).  Furthermore, although Petitioner contends that defense

counsel did not see the evidence discussed by the court, the

transcript of the hearing on counsel's motion suggests that he was

familiar with at least some of the jail incidents mentioned by the

United States District Court
For the Northern District of California

court.  See 5 RT 1002.  Therefore, these arguments are
unpersuasive.

Petitioner also argues that his due process rights were
violated because, in Santa Cruz County, leg braces are routinely
placed on defendants without a hearing by the trial court to
determine whether restraints are warranted.  Because the court
held such a hearing, this is irrelevant.

Petitioner next argues that his Sixth Amendment right to
confront witnesses was violated because he could not cross-examine
witnesses at the hearing on his motion.

The confrontation clause of the Sixth Amendment provides that
in criminal cases the accused has the right to "be confronted with
the witnesses against him."  U.S. Const. amend. VI.  The
confrontation clause applies to all "testimonial" statements.
Crawford v. Washington, 541 U.S. 36, 50-51 (2004).  "Testimony
. . . is typically a solemn declaration or affirmation made for
the purpose of establishing or proving some fact."  Id. at 51
(internal quotation and citation omitted); see id. ("An accuser
who makes a formal statement to government officers bears
testimony in a sense that a person who makes a casual remark to an
acquaintance does not.").

The right to confrontation is "basically a trial right."
Peterson v. California, 604 F.3d 1166, 1170 (9th Cir. 2010)
(finding California Proposition 115, allowing hearsay at
preliminary hearings, does not violate Sixth Amendment).  The
hearing on Petitioner's motion was not part of Petitioner's
criminal trial; the confrontation right did not apply.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

Finally, Petitioner argues that his mental and emotional equilibrium were thrown off balance on the day he was scheduled to testify because the court security officer ordered him to put on the leg brace, even though the trial court had ordered he did not have to wear it that day.  Petitioner contends that this shows that the prosecutor intimidated him and interfered with his ability to testify on his own behalf.  However, Petitioner's conclusion that the court security officer's conduct can be imputed to the prosecution is unsubstantiated by evidence or authority.  The two cases Petitioner cites are inapplicable.  In People v. Bryant, 157 Cal. App. 3d 582, 590 (1984), the court addressed the prosecutor's "intimidating statements."  In Earp v. Ornoski, 431 F.3d 1158, 1168 (9th Cir. 2005), the court addressed the prosecutor's intimidation of a post-trial witness.  Here, no evidence shows the prosecutor caused the court security officer to tell Petitioner to put on his leg brace in spite of the court's order.

In summary, Petitioner fails to present evidence supporting his due process claim based on being required to wear a leg brace during trial.

B. Insufficient Evidence of Assault Conviction

Petitioner argues that his conviction of assault with force likely to produce great bodily injury was not supported by sufficient evidence.  He contends that the victim's testimony that he choked her with two hands, nearly to the point of unconsciousness, was contradicted by physical evidence indicating he grabbed her with only one hand.

1. Federal Authority

The due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt states a constitutional claim, which, if proven, entitles him to federal habeas relief. Jackson v. Virginia, 443 U.S. 307, 321, 324 (1979).

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992). Nor does a federal habeas court in general question a jury's credibility determinations, which are entitled to near-total deference. Jackson, 443 U.S. at 326. If confronted by a record that supports conflicting inferences, a federal habeas court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Payne, 982 F.2d at 338 (quoting Jackson, 443 U.S. at 319). Only if no rational trier of fact could have found

proof of guilt beyond a reasonable doubt may the writ be granted. Jackson, 443 U.S. at 324.

To grant relief under the AEDPA, a federal habeas court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." Boyer v. Belleque, 659 F.3d 957, 965 (9th Cir. 2011); see also Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012) (per curiam) ("Jackson claims face a high bar in federal habeas proceedings . . .").

2. Analysis

The victim testified that Petitioner reached through her open car window with both hands and grabbed her neck tightly, making it difficult for her to breathe, and making her feel like she was going to pass out.  7 RT 1800, 1802, 1928-29; 8 RT 2012.  She testified that Petitioner strangled her with two hands a number of other times while he was raping and sodomizing her.  7 RT 1807, 1830, 1849; 8 RT 2012-15.  The sexual assault nurse who examined the victim testified that the victim had visible injuries on both sides of her neck, though there was a higher level of injury on the right side.  8 RT 2065, 2122-23, 2141-42.  The nurse had taken photographs of the victim's injuries and the photographs were admitted into evidence.  8 RT 2122-26.

Petitioner testified that he grabbed the victim with one hand on one occasion for a short period of time, using only enough pressure to cause bruising so as to support her plan to claim rape.  11 RT 2256.  During closing, defense counsel argued that the victim's testimony that Petitioner choked her with two hands

United States District Court
For the Northern District of California

was not credible because she had a prominent bruise on the right side of her neck, most likely from Petitioner's left thumb, and scratches on the left side of her neck, most likely from Petitioner's fingernails.  Defense counsel argued that, if Petitioner had choked the victim with two hands, there would be corresponding bruises on both sides of her neck.  12 RT 2859-61.

Petitioner submits a declaration from James E. Daly, Doctor of Osteopathy, Master of Science in Biochemistry and Microbiology, which was submitted with his state habeas petition, but was not presented during his trial.  Pet., Ex. L.  Dr. Daly states that he reviewed the photographs of the victim's injuries and concludes that the victim was grabbed by Petitioner with only his left hand. Id. at 4.  Petitioner argues that this evidence shows that the victim's testimony that he choked her with two hands was not credible.  However, the jurors themselves saw the photographs of the victim's injuries, heard the testimony of the victim and Petitioner and found that the force used by Petitioner was likely to produce great bodily injury.  The jury did not have to believe that Petitioner used two hands to have found that he used force likely to cause great bodily injury.  He could have accomplished this with the use of only one hand.  Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find that the testimony of the victim and the examining nurse established that Petitioner was guilty of assault with force likely to produce great bodily injury.  This claim is denied.

C. Ineffective Assistance of Counsel

Petitioner submits fifteen grounds to argue trial counsel's ineffective assistance.

United States District Court
For the Northern District of California

### 1. Failure to Investigate

Petitioner contends counsel was ineffective for failing to investigate the following: (1) whether there was DNA evidence on a redwood tree limb that the victim said Petitioner had placed between her legs; (2) whether there was DNA evidence on the victim's sarong, which Petitioner used to wipe feces off his penis; (3) whether anyone in the victim's neighborhood owned a loud car similar to Petitioner's; and (4) the reason Reverend Vining left California for Ohio.

### a. Federal Authority

A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that particular investigations are unnecessary. Strickland, 466 U.S. at 691; Hinton v. Alabama, 134 S. Ct. 1081, 1088 (2014) (per curiam); Cullen v. Pinholster, 131 S. Ct. 1388, 1407 (2011); Turner v. Duncan, 158 F.3d 449, 456 (9th Cir. 1998). Strickland directs that "'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 491). Counsel need not pursue an investigation that would be fruitless or might be harmful to the defense. Harrington v. Richter, 131 S. Ct. 770, 789-90 (2011).

### b. DNA Evidence

#### (1) Tree Limb

The victim testified that Petitioner laid a limb from a redwood tree over her body and the crevice of her buttocks, but he did not penetrate her with it. 7 RT 1866-67; 8 RT 2037.

United States District Court
For the Northern District of California

Petitioner argues that, because the victim testified that he laid the limb on her body, an absence of DNA on it would diminish her credibility.  The victim's account of the limb constituted such a small portion of her testimony that any lack of DNA would not have damaged her credibility.  Counsel's performance was not deficient for failing to have the limb tested nor has Petitioner shown a reasonable probability of a different result had it been tested. See Harrington, 131 S. Ct. at 789-90 (counsel need not pursue fruitless investigations).

(2) Feces on Sarong

The victim testified that Petitioner sodomized her twice, 7 RT 1825-26, 1837, raped her, 7 RT 1839, sodomized her again, 7 RT 1848, raped her again, 7 RT 1861, but never ejaculated, 7 RT 1862, 1870, 1872-73.  The victim testified that Petitioner used the victim's sarong to wipe off fecal material left on his penis.  7 RT 1865.  The sarong, which the victim identified at trial, had visible fecal stains on it and the nurse who examined the victim found feces in her vagina.  7 RT 1888; 8 RT 2119.  Petitioner contends that, to diminish the victim's credibility, counsel should have had the feces on the sarong tested for DNA.

Petitioner acknowledges that he was told that fecal material could not be tested for DNA but disputes this with a citation to the Reference Manual on Scientific Evidence, 2d ed. at 503-04 (2000), which states, "Thus, DNA typing has been performed successfully on old blood stains, semen, semen stains, vaginal swabs, hair, bone, bite marks, cigarette butts, urine, and fecal material."

United States District Court
For the Northern District of California

However, Petitioner does not state whose DNA he wanted the
the fecal material to be tested for and how any result would have
impeached the victim or otherwise have aided his defense.  Because
Petitioner admitted that he raped and sodomized the victim, his
identity was not at issue.  Whether or not Petitioner's DNA was
found would not have been probative of anything in dispute.
Likewise, there was no reason to test for the victim's DNA because
that also would not be probative of any issue in dispute.

Therefore, defense counsel did not act unreasonably in
failing to test the fecal material for DNA.  See Harrington, 131
S. Ct. at 789-90 (counsel need not pursue an investigation that
would be fruitless).  Counsel's decision not to test the fecal
material did not constitute ineffective performance.

c. Neighbors' Cars

Petitioner claims that, to rebut the testimony of the victim
and her lover, R.F., that they had heard a car that made a
distinctive rattling noise like Petitioner's driving by R.F.'s
house in the weeks preceding the sexual assault, counsel should
have investigated R.F.'s neighbors' cars to see if any of them
made a similar rattling noise.  7 RT 1759-60; 1790; 1793; 1821;
1884.  Petitioner argues this was important to counter the
prosecutor's argument that Petitioner had been stalking the victim
in the weeks preceding the offense.

Petitioner provides no reason to believe that such an
investigation would have been fruitful.  There was sufficient
evidence that Petitioner was the person who had been driving by
R.F.'s house before the assault.  R.F testified that she lived in
a remote area, on a single-lane road with only two neighbors past

her house.  7 RT 1757-58.  She stated that any car coming down that single-lane road would belong to someone living in or visiting those two houses.  7 RT 1758.  She testified that, in the two months before the sexual assault, she heard a loud car, with a noise like it had no muffler, driving by her house late at night and sometimes during the day.  7 RT 1759.  The victim testified that, during the assault, Petitioner told her that he knew that she and R.F. were lovers.  7 RT 1821.  The victim testified that she was "shocked that he knew about [R.F.], and then I made the connection of the car and the sound of the car and that we heard that car around. . . ."  7 RT 1821.

The facts that the victim recognized the distinct sound of Petitioner's car at the scene of the crime as the car she heard driving by R.F.'s house, and that Petitioner had information about R.F., provided strong evidence that Petitioner had been driving by that house and watching the victim in the weeks before the offense.  Even if counsel had found a car with a loud sound, it would not have been sufficient to counter the evidence that Petitioner had been driving by R.F.'s house and watching the victim.

d. Reverend Vining's Departure from Santa Cruz

Petitioner argues that counsel was ineffective for failing to investigate the reason Reverend Vining left Santa Cruz and moved to Ohio.  Petitioner contends that Reverend Vining "was forced to leave the Santa Cruz church as a direct consequence of Petitioner's arrest, the ensuing publicity and the loss of confidence by the membership of the Church" and counsel could have impeached Reverend Vining with this evidence because it would have

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  caused Reverend Vining to resent Petitioner.  Pet. at 54.
2  However, the evidence does not support Petitioner's theory.

3      When Reverend Vining testified at Petitioner's trial, he was
4  living in Ohio.  8 RT 2178.  Reverend Vining testified that he
5  came to Santa Cruz to re-start the Free Methodist Church, but it
6  never re-started.  8 RT 2169; 2171; 2178.  He testified that he
7  had visited Petitioner in jail shortly after Petitioner was
8  arrested and, at this meeting, Petitioner confessed to him.  8 RT
9  2172; 2175.  Immediately afterward, Reverend Vining told his wife
10 what Petitioner had said.  8 RT 2176.  He also relayed
11 Petitioner's statements to two gentlemen who were helping him
12 start the church.  8 RT 2177.  A few months later, he told law
13 enforcement about Petitioner's statements.  8 RT 2177.  On cross-
14 examination, defense counsel asked Reverend Vining if he had any
15 ill will toward Petitioner and Reverend Vining replied, "No.  We
16 are friends."  8 RT 2178.

17     The evidence shows that Reverend Vining communicated
18 Petitioner's confession to three people immediately after his
19 meeting with Petitioner, before he could have been aware that
20 Petitioner's arrest allegedly would cause his church to fail and
21 force him to move to Ohio.  Thus, when Reverend Vining repeated
22 Petitioner's statements to others, he had no reason to resent
23 Petitioner for causing him to move to Ohio.  Counsel's failure to
24 investigate the reason for Reverend Vining's move to Ohio based
25 upon Petitioner's speculation about Reverend Vining's resentment
26 was not ineffective.  See, Harrington, 131 S. Ct. 789-90 (counsel
27 need not pursue investigation that would be fruitless).

28

33

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court

For the Northern District of California

### 2. Failure to Call Experts

Where the evidence does not warrant it, the failure to call an expert does not amount to ineffective assistance of counsel. Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999) (a decision not to pursue testimony by a psychiatric expert is not unreasonable when the evidence does not raise the possibility of a strong mental state defense).

### a. Medical Expert

Petitioner argues counsel should have called an expert to testify that the victim's physical injuries demonstrated that Petitioner grabbed her neck with one hand, not two.  In support of this claim, Petitioner presents the declaration of Dr. J. E. Daly, discussed above, who reviewed the photographs of the victim's injuries and concluded that she was choked with only one hand. Petitioner speculates that, if counsel had presented Dr. Daly's testimony at trial, the jury would not have found Petitioner guilty of assault with force likely to cause great bodily injury. However, as discussed above, finding that Petitioner choked the victim with two hands was not a prerequisite for the jury to have found him guilty of using force likely to produce great bodily injury.  Dr. Daley's testimony may have undermined the victim's testimony that Petitioner used two hands to choke her, but it would not have placed into question her testimony that Petitioner choked her with great force.  The jury saw the photos of the victim's injuries which showed that she was injured more on one side of her neck than the other and defense counsel argued that this showed she was only choked with one hand.  Nevertheless, the jury found that Petitioner had used sufficient force to find him

34

guilty of assault with force likely to produce great bodily

injury.  Petitioner has not shown a reasonable probability of a

different result if the jury heard Dr. Daly's testimony.

b. Corrections Expert

Petitioner claims counsel was ineffective for failing to call

a corrections expert who could have bolstered Petitioner's

credibility by testifying that Petitioner's previous years in

prison motivated him to abide by a prison code of "integrity"

which included not cooperating with police.  Petitioner argues

that this would have explained to the jury why, when the police

asked him where he was at the time of the crime, he originally

lied to them and said he was in San Jose.

Counsel argued to the jury that Petitioner's response to the

police was an example of his integrity because he kept his promise

to the victim not to expose their plan of a "staged sexual

assault."  In his closing, defense counsel stated:

> As Mr. Allen candidly admitted here, one thing he does,
> all true to, is integrity. . . . When he makes a promise
> to someone, when he makes a deal, when he makes an
> agreement, when he makes an arrangement, he has
> integrity and he sticks by it and he stuck by it.  It
> was falling around—falling apart around him as
> Detective Gazza continued to question him, but he stuck
> to one thing.  He stuck to his integrity not to disclose
> that plan, that arrangement.

12 RT 2864-65.

Because Petitioner's defense relied on his alleged agreement

with the victim, counsel strategically emphasized Petitioner's

integrity in keeping to that agreement.  Counsel reasonably could

have thought that testimony regarding a prison code of integrity

which required Petitioner to lie to the police might hinder his

defense instead of helping it.  Furthermore, if the jury did not

believe Petitioner's testimony regarding his agreement with the
victim, it is unlikely that expert testimony about the prison code
of lying to the police would have strengthened his credibility.
Therefore, counsel's failure to call a corrections expert was
neither deficient nor prejudicial.

### 3. Failure to Call Character Witnesses

Petitioner contends that counsel was ineffective for failing
to call three of his family members who would testify that he had
a difficult time adjusting to society after he was released from
prison.  Petitioner states that Janis Jones, his sister, would
have testified that, after Petitioner was released on parole, she
had to assist him in purchasing necessary, everyday things that a
normal person would take for granted.  Petitioner states that his
two nieces would have testified that, after Petitioner was
released on parole, they had to help him buy groceries because he
could not go into a grocery store without experiencing a panic
attack.  Petitioner argues that this testimony would have helped
the jury understand his difficulties in adjusting to society after
his release from prison, and would have bolstered his credibility.

Petitioner's adjustment problems after his release from
prison did not excuse or mitigate the sexual crimes he committed.
Counsel cannot be faulted for failing to introduce testimony that
was irrelevant to the issue of whether Petitioner sexually
assaulted the victim.  Counsel's failure to call Petitioner's
family members was neither deficient nor prejudicial.

### 4. Failure to Enlarge Photographs

Petitioner argues that counsel was ineffective for failing to
enlarge photographs of the less injured side, or left side, of the

United States District Court
For the Northern District of California

victim's neck to counter the prosecution's enlarged photographs of
the more injured right side of her neck.

The nurse who examined the victim after the assault testified
that there were some injuries on the left side of the victim's
neck, though they were not as extensive as the injuries on the
right side of her neck.  Counsel could reasonably have decided
that enlarging the photos of the left side of the victim's neck
would have emphasized the injuries on that side, undermining his
argument that the disparity between the injuries on the two sides
of the victim's neck showed Petitioner choked her with only one
hand.  Furthermore, as discussed previously, whether Petitioner
choked the victim with one hand or two was not determinative of
whether he assaulted her with force likely to produce great bodily
injury.  Therefore, Petitioner fails to demonstrate counsel
performed ineffectively by not showing the jury enlarged photos of
the left side of the victim's neck.

                    5. Failure to Impeach Witnesses

                         a. The Victim

Petitioner argues that counsel should have impeached the
victim with the the tape of her interview with Detective Robert
MacAulay.  According to Petitioner, the tape would show that,
during the interview, when Detective MacAulay left the room, the
victim took notes from her purse, reviewed them and, when
Detective MacAulay returned, she quickly replaced her notes into
her purse.  Petitioner contends that this would show that the
victim was not truthful.  Petitioner also contends counsel could
have impeached her with her testimony that she gave her notes to

Detective MacAulay because Detective MacAulay testified that she did not give him her notes.

Defense counsel's impeachment of the victim on this issue was not deficient or prejudicial. Counsel cross-examined the victim about her use of notes during the police interview. He elicited from the victim testimony that she wrote notes before her interview with Detective MacAulay and, at one point during the interview, she asked Detective MacAulay to retrieve her purse in which she had the notes. 8 RT 2032-34. The victim stated that, after Detective MacAulay brought her the purse, she got her notes out from the purse and referred to them several times during the interview. The victim also testified that either she left the notes at the police station, gave them to Detective Macaulay or threw them away. During the defense case, counsel called Detective MacAulay and elicited his testimony that the victim brought notes to her interview with him and he did not take those notes or obtain copies of them. 10 RT 2519.

Because counsel questioned the victim about her notes and she admitted she used them during her interview with Detective MacAulay, playing the videotape of the interview to show that the victim used notes would have been redundant. Counsel was not ineffective for failing to show the videotape. Furthermore, the victim did not say she gave her notes to Detective MacAulay, as Petitioner suggests, but testified that she either gave them to him, left them at the station or threw them away. Petitioner's claim that Detective MacAulay's testimony would have impeached the victim is not accurate.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Petitioner also contends that the tape shows that the victim had "no new details to offer and no new insights from her long 'spiritual' journey to 'recovery.'"  Petitioner argues that this is demonstrated by the fact that, during the interview, the victim showed little of the emotional turmoil that she demonstrated during the trial.  Pet. at 59.  Petitioner apparently is inferring that the victim's lack of emotion during her interview shows that her trial testimony about a spiritual journey to recovery after the sexual assault was not believable.  Petitioner's failure to mention this claim in his traverse may be an indication that he is abandoning it.  In any event, that counsel did not question the victim about her "lack of emotion" during the interview or about her emotional recovery appears to be a reasonable strategic decision not to upset or badger a sympathetic witness, which would have been prejudicial to Petitioner's case.  Counsel's decision not to impeach the victim regarding her emotional state of mind was neither deficient nor prejudicial.

### b. Reverend Vining

Petitioner argues that counsel was deficient for failing to impeach Reverend Vining with the reasons he moved to Ohio.  This argument was addressed above in regard to Petitioner's claim that counsel was ineffective for failing to investigate why Reverend Vining moved to Ohio.  For the same reasons that counsel was not ineffective for failing to investigate this issue, he was not ineffective for failing to impeach Reverend Vining on this theory.

### 6. Failure to Assert Due Process Challenge

Petitioner claims counsel was ineffective for not preserving an issue that the Court of Appeal determined was forfeited because

it was not argued before the trial court, namely, whether the state clergy-penitent privilege is "congruent with the Free Exercise Clause in its pre-1990 manifestation." Pet. at 62.  As discussed previously, the state court's decision that the clergy-penitent privilege did not apply to Petitioner could not support a due process claim.  Therefore, counsel's failure to assert it during Petitioner's trial was not ineffective.  See Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005) (trial counsel cannot have been ineffective for failing to raise a meritless motion).

### 7. Failure to Object

Petitioner contends that trial counsel was ineffective because he failed to object to the prosecutor's alternate theories in closing argument that the crimes were opportunistic and the result of stalking.

The prosecutor argued that Petitioner was stalking the victim with the intent to rape her and, on the day of the crime, found an opportunity to carry out his intent when he saw her parked on the side of a deserted road.  11 RT 2885.  This argument was not inconsistent.  Counsel's failure to object was not ineffective assistance.  See Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999) (petitioner did not show that (1) had counsel objected, it was reasonable that trial court would have sustained objection as meritorious; and  (2) had objection been sustained, it was reasonable that there would have been an outcome more favorable to petitioner).

//

//

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

8. Failure to Argue

a. Failure to Counter Prosecutor's Argument

Petitioner contends trial counsel failed to counter the prosecutor's closing argument.  Counsel countered that Petitioner had made an agreement with the victim to pretend to rape her, and that the contrary testimony of the victim and Reverend Vining was not credible.  <u>See</u> 11 RT 2859-71.  Counsel cannot be faulted for making an argument based on Petitioner's testimony and the evidence presented to the jury.

b. Victim Accomplished Her Goals

Petitioner argues that counsel was ineffective for failing to argue that the victim accomplished her goals for enlisting his help to stage a rape—that is, the victim (1) obtained full custody of her son; (2) received full financial support from the child's father; and (3) broke away from her son's father to live with another.  Pet. at 63.  Petitioner contends that, if counsel had emphasized this in his closing argument, Petitioner's credibility would have been bolstered.

The prosecutor called the father of the victim's son to rebut Petitioner's testimony.  The father testified that he and the victim shared time caring for their son, that the victim's relationship with R.F. did not cause any tension between himself and the victim, that his relationship with the victim was loving and they liked spending time with each other as shown by the fact that they took vacations together.  10 RT 2727-30.

Contrary to Petitioner's argument, the evidence did not show that the victim had full custody of her son or that she received full financial support from the father of her son.  Rather, the

United States District Court
For the Northern District of California

evidence showed that the father and the victim had a friendly, loving relationship that would not require the victim to ask Petitioner to pretend to rape her in order to accomplish her "goals" with her son's father.  Counsel's failure to argue that the victim "accomplished" her goals was not ineffective because the evidence did not support such an argument.

    9. Stipulation Against Petitioner's Interests

Petitioner argues counsel was ineffective for entering into a stipulation about the room in which Petitioner met with Reverend Vining.

Petitioner's counsel offered a stipulation that before Reverend Vining met with Petitioner at the Santa Cruz County Jail, the jail chaplain, Chaplain Seifert, explained to Reverend Vining "that the type of room in which he was meeting with Mr. Allen was an attorney-contact room in which conversations are not recorded." 3 RT 507.  The prosecutor added to the stipulation that "none of that information was communicated to Mr. Allen.  Mr. Seifert didn't communicate with Mr. Allen at all." 3 RT 507.  Defense counsel did not object and the court accepted the stipulation. Id.  Petitioner submits his declaration in which he states that Chaplain Seifert told him that his meeting with Reverend Vining "would be in an attorney-client room and remain confidential." Pet. at 65, Exh. K ¶ 21.  Petitioner declares that, based on Chaplain Seifert's representation, he agreed to meet with Reverend Vining.  Id.  Petitioner also declares that he informed counsel of this.  Id.

Petitioner argues that the stipulation was prejudicial because the state court determined that his conversation with

Reverend Vining was not confidential based, in part, on the fact that Petitioner did not know their conversation could not be overheard.

Assuming counsel knew that Petitioner believed his conversation with Reverend Vining could not be overheard, counsel's stipulation that Petitioner lacked such knowledge may have constituted deficient performance.  However, Petitioner has not established prejudice.

As discussed above, under California Evidence Code section 1032, the privilege only applies when a communication is made to a member of the clergy who has a duty to keep the communication secret.  The Court of Appeal based its conclusion that the clergy-penitent privilege did not apply to Petitioner's confession to Reverend Vining, in part, on the fact that, when Reverend Vining spoke with Petitioner, he was not acting as a member of the clergy.  See People v Allen, 2008 WL 214856, at *8.  Petitioner's knowledge about the room in which he spoke with Reverend Vining would not change the Court of Appeal's finding that Reverend Vining was not acting as a minister during this conversation. Because Petitioner has not shown a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, this claim fails.

In summary, none of Petitioner's arguments establish that his trial counsel's performance was ineffective.

D. Ineffective Assistance of Appellate Counsel

Petitioner argues that appellate counsel was ineffective because he failed to raise the following claims on appeal: (1) the policy of the Santa Cruz County Sheriff's Department of routinely

using physical restraints on defendants during trial violates due process; (2) the denial of his motion to recuse the trial judge violated his due process rights; (3) admission of his rape fantasies violated his Fifth Amendment rights; (4) the prosecutor committed misconduct by denigrating defense counsel; (5) insufficient evidence supported the charge of assault with force likely to produce great bodily injury; and (6) trial counsel was ineffective.

### 1. Federal Authority

The due process clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland. Smith v. Robbins, 528 U.S. 259, 285 (2000). First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a meritorious issue. Id. Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. Id.

Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by the defendant. Jones v. Barnes, 463 U.S. 745, 751-54 (1983). The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. Miller v. Keeney, 882 F.2d 1428, 1434 (9th

Cir. 1989).  Appellate counsel therefore will frequently remain
above an objective standard of competence and have caused his
client no prejudice for the same reason——because he declined to
raise a weak issue.  Id.

>        2. Analysis

Many of the grounds for Petitioner's claims of ineffective
assistance of appellate counsel have been discussed above and have
been denied.  These are the claims based on (1) the leg brace;
(2) insufficient evidence of assault with force likely to cause
great bodily injury; and (3) ineffective assistance of trial
counsel.  Because these claims have no merit, appellate counsel
was not ineffective for failing to assert them on appeal and
Petitioner has not shown a reasonable probability that the result
would have been different had counsel done so.

In a letter to Petitioner, appellate counsel explained his
reasons for not raising the remaining claims Petitioner suggested.
See Pet., Ex. K, App'x. 3 (appellate counsel's letter to
Petitioner).

>        3. Judicial Bias

During the trial, Petitioner, under California Civil
Procedure Code section 170.1, filed a pro se motion for recusal of
the trial judge based on a comment that he made during jury
selection.  Ex. K, App'x. 3 at 2.  The motion was referred to
another judge, who rejected it.  Id.  Appellate counsel informed
Petitioner that he would not assert a claim of judicial bias
because the judge's comment was "a very thin reed to support so
weighty a claim" and no other evidence showed that the judge was
biased.  Exh. K, App'x. 3 at 2.

**United States District Court**
For the Northern District of California

### 4. <u>Miranda</u> Violation

Petitioner claims appellate counsel should have argued that admitting Petitioner's rape fantasies violated his Fifth Amendment rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).  Appellate counsel reminded Petitioner that he had raised this issue on appeal as grounds for a claim of ineffective assistance of counsel and a violation of California Evidence Code sections 352 and 1101. Appellate counsel explained that the admission of the rape fantasies did not constitute a <u>Miranda</u> violation because statements given without a <u>Miranda</u> warning are suppressed only for the prosecutor's case in chief, but may be used to impeach the defendant.  Because the prosecutor used the rape fantasies only to impeach Petitioner, there was no Fifth Amendment right to suppression.  Exh. K, App'x. 3 at 3.  Appellate counsel also informed Petitioner that he could not claim that Petitioner's statements to the psychologist were involuntary because the evidence supported the finding that Petitioner made the statements voluntarily.  <u>Id.</u>

### 5. Prosecutorial Misconduct

Petitioner argues that appellate counsel should have asserted a claim of prosecutorial misconduct based upon the prosecutor's closing remark that defense counsel was fabricating a defense. Appellate counsel pointed out to Petitioner that the prosecutor did not argue that defense counsel was fabricating a defense, but that Petitioner was fabricating a defense, which was a proper closing argument for the prosecutor.  Exh. K, App'x. 3 at 3.

In summary, appellate counsel's explanations to Petitioner demonstrate that he made considered, tactical decisions not to

raise the claims Petitioner suggested.  His considered, strategic choices do not constitute ineffective assistance of counsel.  See Jones, 463 U.S. at 752-53 (appellate counsel's obligation is to examine the record to select most promising issues for review and to weed out weaker arguments).  Therefore, the claim of ineffective assistance of appellate counsel is denied.

E. Cumulative Effect of Errors

Petitioner argues the cumulative effect of all the alleged constitutional errors entitles him to habeas relief.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011).  Where no single constitutional error exists, nothing can accumulate to the level of a constitutional violation.  Id.

As discussed above, no constitutional errors were made during Petitioner's trial.  Therefore, no errors could accumulate to the level of a constitutional violation.  This claim is denied.

IV. Evidentiary Hearing

Petitioner moves for an evidentiary hearing on several claims.  Petitioner has failed to state a claim for habeas relief. There are no material factual disputes in the record that, if resolved in Petitioner's favor, would entitle him to relief. Accordingly, Petitioner's request for an evidentiary hearing on any ground is denied.  See Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (no hearing required if allegations, viewed against the record, fail to state a claim for relief).

V. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling. Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate must indicate which issues satisfy this standard. 28 U.S.C. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The Court finds that reasonable jurists would not find its ruling on any of Petitioner's claims debatable or wrong. Therefore, a certificate of appealability is denied.

Petitioner may not appeal the denial of a certificate of appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. See Rule 11(a) of the Rules Governing Section 2254 Cases.

CONCLUSION

Based on the foregoing, the Court orders as follows:

1. The petition for a writ of habeas corpus is denied.

2. The request for an evidentiary hearing is denied.

3. The Clerk of the Court shall enter a separate judgment, terminate all pending motions and close the file.

4. A certificate of appealability is denied.

IT IS SO ORDERED.

Dated:   September 26, 2014

_____
CLAUDIA WILKEN
UNITED STATES DISTRICT JUDGE